1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TONY ROBERTS,

11              Plaintiff,                    No. 2:08-cv-2624 JAM KJN P

12        vs.

13   MATTHEW CATE, et al.,

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  This case is proceeding on the third amended complaint, filed September 10,

19   2010.  Plaintiff alleges that defendants were deliberately indifferent to plaintiff's serious mental

20   health needs by transferring him to California Men's Colony ("CMC").  On May 31, 2012,

21   defendants Cate and Knowles[1] filed a motion for summary judgment.  On June 27, 2012, plaintiff

22   filed an opposition.

23              On July 19, 2012, plaintiff was provided notice of the requirements for opposing a

24   motion for summary judgment, Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998), and

25   _____

26        [1] Defendant Marshall was dismissed from this action on January 28, 2011.  (Dkt. No.
     40.)

                                              1

1  provided an extension of time to file further opposition.  On August 23, 2012, plaintiff filed a

2  supplemental opposition.  Defendants did not file a reply.  As explained below, the court

3  recommends that defendants' motion for summary judgment be granted.

4  II.  Plaintiff's Allegations

5        Plaintiff proceeds on the unverified[2] third amended complaint filed September 10,

6  2010, alleging that defendants were deliberately indifferent to plaintiff's serious mental health

7  needs by either intentionally interfering with plaintiff's prescribed mental health treatment or

8  failing to comply with ready access to adequate mental health care by transferring plaintiff to

9  CMC.  Plaintiff contends that CMC was not equipped to address plaintiff's mental health needs.

10  Plaintiff argues that on December 27, 2007, his mental health provider recommended that

11  plaintiff be transferred to a correctional facility close to plaintiff's family in southern California,[3]

12  because it would provide a stabilizing factor for plaintiff's psychological issues.  (Dkt. No. 31 at

13  3.)  Plaintiff contends that defendants transferred plaintiff from the California Medical Facility

14  ("CMF") in Northern California based on this recommendation.  However, defendants

15  transferred plaintiff to CMC, which is in Central California, and which allegedly only provides

16  entertainment videos as a substitute for therapeutic treatment, rather than transferring plaintiff to

17  a southern California facility which offers standard structured therapy as recommended by mental

18  health staff.  (Id.)

19        Plaintiff contends defendant Cate failed to take corrective measures during the

20  third level review on October 7, 2008,[4] by refusing to rectify his subordinates' failure to comply

21

22      [2]  Plaintiff's opposition to the motion is not signed under penalty of perjury, and his
23  supplemental opposition is not signed under penalty of perjury.  (Dkt. Nos. 79, 83.)  However,
    plaintiff provided declarations in support of his opposition.

24      [3]  Plaintiff's family lives in San Diego, California.  (Dkt. No. 77-5 at 9.)

25      [4]  Plaintiff now concedes that defendant Cate did not personally participate in the decision
26  at the third level of review, but plaintiff claims defendant Cate had personal knowledge from the
    letter plaintiff mailed to defendant Cate on November 19, 2008.  (Dkt. No. 79 at 4.)

with the December 27, 2007 recommendation, and which delayed plaintiff's receipt of appropriate mental health care.  Plaintiff argues that because defendant Cate was aware of deficiencies in the provision of mental health care to inmates held by the California Department of Corrections and Rehabilitation ("CDCR"), defendant Cate failed to take steps to avert an obvious risk to plaintiff's health and safety.

In addition to citing defendant Knowles' supervisory role, plaintiff contends that defendant Knowles failed to take corrective measures during the second level appeal review on May 22, 2008, which allegedly interfered with, and delayed, plaintiff's mental health care.

III.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the following grounds:  (a) plaintiff failed to establish defendants' personal involvement in the decision to transfer plaintiff to CMC, or a causal connection thereto; (b) the transfer decision was consistent with CDCR regulations; (c) plaintiff failed to establish a constitutional violation with respect to his inmate appeal because defendant Cate had no personal involvement in the appeal response, and defendant Knowles' second level response does not give rise to any claim for relief under 42 U.S.C. § 1983; (d) neither defendant was deliberately indifferent to plaintiff's serious mental health needs because there is no evidence that either of them denied, delayed, or interfered with plaintiff's mental health care; (e) the Coleman class action does not impute to defendant Cate knowledge of allegedly gross deficiencies in the provision of mental health care to plaintiff at CMC; (f) plaintiff's disagreement with the course and scope of his mental health care treatment does not support a claim of deliberate indifference; and (g) the undisputed facts demonstrate that plaintiff received more than adequate treatment for his mental health needs following his initial transfer to CMC.

A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

3

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law. " Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

burden of production may rely on a showing that a party who does have the trial burden cannot

produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

should be entered, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then

shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

to establish the existence of such a factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material in support of its contention that such a

dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6   1436 (9th Cir. 1987).

7           In the endeavor to establish the existence of a factual dispute, the opposing party

8   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

9   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

10  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

11  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

12  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

13  committee's note on 1963 amendments).

14          In resolving a summary judgment motion, the court examines the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

24  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

26  ////

5

By orders filed February 27, 2009, and July 19, 2012, the court advised plaintiff of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. Nos. 13, 80); see Rand, 154 F.3d at 957.

### B.  Additional Applicable Legal Standards

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no affirmative link between the incidents of police misconduct and the adoption of any plan or policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

A supervisory official is not liable for the actions of subordinates on a respondeat superior theory under 42 U.S.C. § 1983.  Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001) (citing Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir.1989)).  "A supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Id.  A causal connection is "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct."  Rizzo v. Goode,

1  423 U.S. 362, 371 (1976).  The inquiry into causation "must be individualized" and focused on

2  the duties and responsibilities of the individual defendant whose acts or omissions are alleged to

3  have caused a violation.  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

4              C.  Undisputed Facts

5         For purposes of the instant motion for summary judgment, the court finds the

6  following facts undisputed.

7              1.  On December 27, 2007, a clinician, Dr. McDougald, recommended that

8  plaintiff be transferred from the CMF, in Vacaville, to a prison close to his family in Southern

9  California.[5]

10             2.  On February 29, 2008, at Unit Classification Committee ("UCC") at CMF

11  recommended a transfer to the Richard J. Donovan Correctional Facility ("RJD") so that plaintiff

12  could be closer to his family.  An alternate recommendation was made for transfer to the CMC.

13             3.  On March 18, 2008, a Classification Staff Representative ("CSR") endorsed

14  plaintiff for transfer to CMC.

15             4.  On April 3, 2008, plaintiff was transferred to CMC.

16             5.  Neither Knowles nor Cate sat on the UCC or acted as the CSR making the

17  transfer decision.

18  _____

19         [5]  Dr. McDougald's recommendation stated:

20  [Plaintiff] is a 49 y/o [African American] male with an extensive mental health
    [history] beginning when he was 9 y/o.  [Plaintiff's] current Axis I [diagnosis] is

21  Schizoaffective disorder.  He has had several MHCB admissions in recent years.
    Family psychiatric [history] include both his mother and daughter whom

22  reportedly committed suicide.  [Plaintiff] is currently being treated with
    antipsychotic and mood stabilizing medication.  He has had two [suicide

23  attempts], most recently in 3/5/07 when he attempted to hang himself from a light
    fixture with a sheet.  His current [symptoms] include perceptual disturbances,

24  hallucinations, paranoia and guilt.  His protective, stabilizing factors appear to be
    his family.  It is for this reason that this clinician feels that [plaintiff] would

25  benefit from a placement in a correctional facility close to his family in Southern
    California.  [Plaintiff] does not pose a threat to himself or others at this time.

26  (Dkt. No. 77-5 at 11.)

6.  Plaintiff was first seen related to his psychiatric needs at CMC on April 4, 2008.

7.  Plaintiff was seen regularly thereafter by therapists and was provided with medication as well as talk therapy.

8.  On March 25, 2008, plaintiff filed an administrative appeal trying to prevent the transfer to CMC.

9.  On March 26, 2008, the appeal was returned to plaintiff because he had failed to attach a copy of the classification chrono.

10.  On May 22, 2008, after plaintiff provided appeals with a copy of the chrono, Knowles signed off on an appeal response denying the appeal.  (Dkt. No. 77-5 at 15-16.)

11.  The determination for the denial of the appeal states:

> The arguments and evidence presented are persuasive that [plaintiff] was appropriately classified and endorsed to a facility that is closer to [plaintiff's] family in Southern California, although not to RJD where [plaintiff] wished to transfer.  The [plaintiff] was seen by a Classification Committee, which reviewed all case factors prior to taking a recommendation for transfer.  The transfer recommendation was reviewed and endorsed by a CSR who determined the appropriate housing based on the Departmental needs, safety and security, the [plaintiff's] placement score and administrative determinates.  The alternate facility was chosen by the CSR.  The endorsement was consistent with Penal Code section 5068 as far as availability of programs and housing.

(Dkt. No. 77-5 at 16.)[6]

12.  CMF is located in Northern California.[7]  (Dkt. No. 77-5 at 15-16.)

_____

[6]  Defendants contend that the appeal was denied because the CSR had considered all of the relevant information and had acted in accordance with departmental policy.  (Dkt. No. 77-5 at 15-16.)  Plaintiff disputes this fact, stating that the EOP census for general population EOP census shows that there was available bed space at a prison close to his family in San Diego.  (Dkt. No. 79 at 89.)  Plaintiff appears to rely on his Exhibit H.  (Dkt. No. 79 at 67.)

[7]  CMC is located in San Luis Obispo, California.  Defendants cite the May 22, 2008 second level appeal response as the source for their view that CMC is located in Southern California.  However, the May 22, 2008 second level appeal response does not establish that CMC is located in Southern California.  Plaintiff declares that according to the televised local

8

1        13.  CMC is closer to plaintiff's family than CMF.

2        14.  On May 16, 2008, Cate was appointed Secretary of the CDCR.  For four years

3    prior to that time, Cate served as California's Inspector General.

4        15.  Cate did not serve as the Director of Adult Institutions during calendar years

5    2007 and 2008.  (Dkt. No. 77-3 at 2.)

6        16.  Neither Cate nor Knowles participated in the December 27, 2007 preparation

7    of the mental health chrono.[8]  (Dkt. Nos. 77-3 at 2; 77-4 at 2; 77-5 at 11.)

8        17.  Plaintiff's case was reviewed by a classification committee comprised of

9    people knowledgeable concerning the classification process and of transfer considerations.

10        18.  Defendants contend that the CSR endorsed plaintiff's transfer only after

11    giving appropriate consideration to all appropriate case factors and agency policies including

12    housing based on departmental needs, safety, security, plaintiff's placement score and

13    administrative determinates.  (Dkt. Nos. 77-4 at 2-3; 77-5 at 19.)  Plaintiff disputes this fact,

14    claiming that there was GP EOP housing available at this time.  (Dkt. No. 79 at 67, 90.)

15        19.  The CSR endorsed plaintiff's transfer to CMC, the alternate facility

16    recommended, because the factors considered in making the decision, i.e., departmental needs,

17    safety, security, placement score and administrative determinants, dictated that choice.[9]  (Dkt.

18

19    news, CMC is located on the central coast of California.  (Dkt. No. 79 at 23.)

20        [8]  Defendants contend that neither defendant had any knowledge of the contents of the
      December 27, 2007 mental health chrono.  (Id.)  However, plaintiff contends that defendants had
21    knowledge of its contents.  (Dkt. No. 79 at 90.)  Plaintiff cites to the May 22, 2008 second level
      appeal response, signed by Knowles, in which it states that "[t]he transfer recommendation was
22    based on a 128-C Mental Health Chrono dated December 27, 2007 advising that [plaintiff] would
      benefit from placement in a facility closer to family because of psychological issues."  (Dkt. No.
23    79 at 8.)  Plaintiff cites to his November 13, 2008 letter addressed to Jean Lynn, with the Jeff
      Dick's Medical Coalition, which reflects a copy was sent to defendant Cate, Director of Adult
24    Institutions, and a declaration by inmate Donald Hill who declares he typed the letter and
      witnessed plaintiff deposit the letters to Lynn and Cate in the prison mailbox, and to plaintiff's
25    declaration attesting to such mailing.  (Dkt. No. 79 at 14-18, 21.)

26        [9]  Plaintiff disputes this fact, citing his own declaration in which he claims the
      Classification Committee must make sure an inmate has no enemy concerns at the prison and

No. 77-4 at 3.)

20.  At the time plaintiff desired transfer to the Richard J. Donovan Correctional Facility (RJD), plaintiff contends there was no penological reason why he could not be transferred to that facility.  (Dkt No. 83 at 2.)  Defendants contend he could not be transferred to RJD because plaintiff had an enemy at RJD, the EOP program at RJD was overcrowded, and RJD had undergone a mission change.  (Dkt. Nos. 77-5 at 29; 77-9; 77-4 at 3.)

21.  After transferring to CMC, plaintiff was immediately placed in the Enhanced Outpatient Program ("EOP") and he was seen approximately every week.

22.  On June 30, 2008, plaintiff was seen by the Inter-Disciplinary Treatment Team ("IDTT").  He was observed to be self-deprecating, mood congruent, and to have poor personal hygiene in that he smelled strongly.  Plaintiff seemed depressed with a blunted affect and a hopeless attitude.  Plaintiff was oriented as to person, place, time and situation and he was alert.  He claimed to be suicidal and to plan to hang himself.  He claimed auditory hallucinations in that he wanted to harm himself and he had visions of people hanging.  It is unlikely that plaintiff was truly experiencing visual hallucinations but he reported decreased sleep and an intact appetite.  Plaintiff denied any homicidal thoughts.[10]  (Dkt. No. 77-6 at 20.)

23.  Plaintiff was seen and evaluated by the IDTT on September 30, 2008. His treatment plan and mental health placement were reviewed and approved at that time.

24.  Plaintiff was seen by the IDTT on December 16, 2008, and his treatment plan and mental health placement were reviewed and approved.

25.  On March 10, 2009, the IDTT saw plaintiff and approved his treatment plan

that the prison has available bed space, before the inmate could be put up for transfer.  (Dkt. No. 79 at 24, 90.)  However, the instant fact addresses what the CSR considered, not the Classification Committee.

[10]  Plaintiff disputes this fact, citing to his own declaration which states:  "It is not unlikely that [plaintiff] was experiencing auditory hallucinations.  [Plaintiff] has been treated for these symptoms for over 10 years by prison doctors."  (Dkt. No. 79 at 24.)

1   and EOP placement.

2       26.   On June 29, 2008, plaintiff was admitted to a CMC crisis bed because he

3   planned to hang himself.  He was EOP and his psychiatric medication was reviewed.

4       27.   Plaintiff was admitted to a CMC crisis bed on suicide precaution and was

5   pending a change to Correctional Clinical Case Management System ("CCCMS") from EOP.

6   On admission, he denied the change in level of care played a role in his admission to the crisis

7   unit.  His clinical course was uneventful, he made no attempt to harm himself, and he was

8   compliant with his meals but refused psychiatric medication on multiple occasions.

9       28.   When he was discharged from the CMC crisis bed on July 22, 2008, plaintiff

10  was alert, oriented to person, place, time and situation, his speech was clear with normal rate and

11  volume, and he showed normal psychomotor activity.  His thought processes were logical, linear

12  and goal directed and he demonstrated adequate eye contact.  However, his grooming was poor,

13  his mood depressed, and his affect was restricted.  He continued to claim suicidal ideation and

14  auditory hallucinations.  He denied homicidal ideation, visual hallucinations and overt delusional

15  thinking.  His insight was poor, but he showed no thought blocking, loosening of associations

16  or echolalia.

17      29.   Plaintiff's discharge diagnoses were Schizoaffective Disorder, Depressed

18  Type; PCP Dependence in Institutional Remission; Opioid Dependence in Institutional

19  Remission; and ASPD.

20      30.   On September 18, 2008, plaintiff returned to CMC.  His stay at the

21  Department of Mental Health ("DMH") had gone well and his psychosis and depression had

22  lessened.  He was placed in a mental health crisis bed for a move to intake when appropriate.

23      31.   On July 22, 2008, plaintiff was placed in the DMH's unit at CMF.

24      32.   Plaintiff was placed in the CMF DMH unit because he was suicidal, paranoid,

25  anxious, withdrawn, depressed and hallucinating.  He had attempted suicide by hanging at

26  Pleasant Valley State Prison in March 2007, and he had tried to hang himself at RJD in

November 2006.  His stated plan was to commit suicide by hanging.  Plaintiff was diagnosed as having schizoaffective disorder, PCP dependence, and opioid dependence.

33.  On admission to DMH, plaintiff reported that his daughter had committed suicide by overdosing two years earlier and that he had become more and more depressed since that time.  He acknowledged trying to hang himself in March 2007 and November 2006.

34.  In addition to his daughter's suicide, plaintiff's mother killed herself by driving off a cliff in 1985.  Plaintiff was single but had four stepchildren.  He had three sisters and four brothers.  One sister wrote to him in prison, but he did not write to her in return.  He had no other contact with any member of his family.

35.  The initial DMH treatment plan called for continuing plaintiff on Abilify, Cogentin and Remeron.  He was placed on suicide precautions and he was limited in what he could have in his cell for safety reasons.  He was to be monitored and his medication adjusted as needed.  Basic lab tests were ordered, he was continued in supportive therapy and he was to take part in progressive programming in his unit.

36.  Defendants contend that during his initial DMH-UCC (Department of Mental Health - Unit Classification Committee), held on August 4, 2008, the committee noted that plaintiff had a history of using his mental health to manipulate his housing, and referenced a 128-B dated December 5, 2006, written by P. White, Ph.D., a psychologist at RJD.  (Dkt. No. 77-6 at 25.[11])  Plaintiff disputes this fact, citing a copy of his administrative appeal challenging Dr. White's 2006 128-B.  (Dkt. No. 79 at 69-78.)  In the appeal, plaintiff challenged Dr. White's finding that plaintiff fabricated his daughter's death in order to manipulate his housing.[12]  (Id.)

---

[11]  Although defendants cite to their Exhibit B, page 34, the reference to page 34 appears to be a typographical error.  The committee note referred to by defendants is marked "ExB00024," and found at Dkt. No. 77-6 at 25.  Dr. White's 128-B is located at Dkt. No. 79 at 75.

[12]  Dr. White stated that "[plaintiff] manipulated staff by stating that his daughter allegedly committed suicide when there is no proof to this effect.  [Plaintiff] most likely fabricated her death to prevent his transfer to another prison."  (Dkt. No. 79 at 75.)

The appeal was partially granted in that Dr. Daroglou, Ph.D., issued an addendum noting that the death of plaintiff's daughter was confirmed by his daughter's grandmother in a telephone call. (Dkt. No. 79 at 78.)

37. When he was discharged, plaintiff had shown gradual improvement using medication, and supportive and milieu therapy. The voices and auditory hallucinations had decreased and he was no longer suicidal and his level of depression had decreased. He was able to program fully and did not show any self-injurious or threatening behavior. He wanted to be discharged to an EOP level of care, had no "extrapyramidal symptoms or tardive dyskinesia," he ate well and slept well. He interacted with staff and his peers appropriately, kept his cell clean and took showers when given the opportunity. Sometimes the voices told him he was no good but did not tell him to hurt himself or anyone else.

38. On September 16, 2008, plaintiff was discharged to EOP.

39. Plaintiff was treated with Remeron, Abilify and Cogentin.

40. Plaintiff was not 100% compliant in his medication regimen during the relevant time period.[13]

41. When plaintiff was not in treatment at DMH or in the crisis unit, his primary care doctor was Dr. Rice, a psychologist.

42. On May 15, 2008, plaintiff seemed stable, and denied any suicidal thoughts or

_____

[13] Plaintiff declares that he took his medication from 95% to 100% of the time during this period. (Dkt. No. 79 at 24.) Some of the medical records support this statement. (Dkt. No. 77-6 at 6 (5/2/08 compliant); 7 (5/15/08 compliant); 9 (5/23/08 compliant; missed a few times due to a cold); 11 (5/29/08 compliant); 13 (6/6/08 compliant); 15 (6/13/08 compliant); 17 (6/19/08 compliant); 19 (6/27/08 compliant); Dkt. No. 77-7 at 10 (9/29/08 "taking meds"), 13 (10/18/08 "taking medications regularly"); 14 (10/22/08 - missed once due to doctor's appointment); 16-18 (11/13/08; 11/21/08; 11/26/08); 23 (12/17/08); 24 (12/24/08 compliant per his report); and 25 (12/31/08 taking meds per his report). However, the July 22, 2008 narrative discharge and transfer summary from plaintiff's release from the MHCB, states that plaintiff "refused his psychiatric medications on multiple occasions." (Dkt. No. 77-6 at 20.) On May 23, 2008, a "Medication Non-Compliance" form was completed that listed varying percentages for plaintiff's compliance with his medication regimen ranging from 80% to 95% to 100%, depending on the drug and time of day. (Dkt. No. 77-6 at 10.) Thus, defendants contend that sometimes plaintiff took his medication and sometimes he refused to take it. (Dkt. Nos. 77-6 at 10, 77-7 at 10.)

1   plans.[14]  (Dkt. No. 77-6 at 7.)

2          43.  Dr. Rice planned to monitor plaintiff's condition on a weekly basis.

3          44.  On May 23, 2008, plaintiff reported auditory hallucinations and delusions.

4   Dr. Rice discussed coping skills with him.

5          45.  In addition, plaintiff was found to be 80-95% compliant when it came to

6   taking his medication.

7          46.  On May 29, 2008, plaintiff was seen cellside because a lockdown was in

8   effect.  He seemed stable.

9          47.  On June 6, 2008, Dr. Rice prepared a 30-day treatment summary and EOP

10  follow-up.  She noted plaintiff tried to cope by blocking out the voices and closing his eyes.  She

11  discussed reading, music and watching television as other strategies he could use. He asked about

12  group therapy and she told him he was on a waiting list.  Dr. Rice believed plaintiff was trying

13  hard to appear worse than he was.[15]  (Dkt. No. 77-6 at 12.)

14         48.  Dr. Rice assessed plaintiff's appearance/behavior, mood/affect, speech,

15  appetite, perceptual disturbance, thought process/cognition, violence risk, suicidality and

16  medication issues.  (Dkt. No. 77-6 at 13.)

17         49.  On June 13, 2008, Dr. Rice reported plaintiff's symptoms as uncommon and

18  exaggerated.  She further noted that he malingered to remain at the EOP level of care.

19  
20         [14]  Plaintiff disputes this fact, declaring that between April and June 2008, he
    intermittently reported auditory hallucinations and suicidal ideation, and that his reported
21  symptoms were never addressed or documented because of clinicians' negative predisposition
    based on Dr. White's 128-B alleging that plaintiff was manipulating or malingering.  (Dkt. No.
22  79 at 21-22.)  However, in Dr. Rice's May 15, 2008 EOP progress notes, Dr. Rice noted that
    plaintiff complained of seeing visions, thought people were talking about him, yet denied he was
23  suicidal, stating that plaintiff's last suicidal thought was a month ago.  (Dkt. No. 77-6 at 7.)
    Thus, Dr. Rice, on this occasion, did not fail to note plaintiff's symptoms.  This fact is deemed
24  undisputed.

25         [15]  Plaintiff disputes facts 47-51, relying on his personal declaration (dkt. no. 79 at 21-22)
    stating that mental health clinicians were predisposed to find he was malingering based on Dr.
26  White's erroneous 128-B.  See n.15 infra.  However, plaintiff provided no expert opinion
    rebutting Dr. Rice's clinical observations or conclusions.

1  She advised plaintiff to think about a change to the CCCMS level of care because he had been

2  stable over the past few treatment periods.  She predicted that he would claim an increase in

3  symptomology.  (Dkt. No. 77-6 at 15.)

4        50.  On June 19, 2008, plaintiff reported more depression, but he did not use any

5  coping skills to alleviate the symptoms.  Dr. Rice noted plaintiff's history of malingering to stay

6  at the EOP level of care and she planned to monitor his condition while helping him adjust to the

7  idea of CCCMS.  (Dkt. No. 77-6 at 17.)

8        51.  On June 27, 2008, plaintiff was seen at his cell because of a lockdown. He

9  reported feeling more depression but his mood was a 6 on a scale of 1-10, with 10 being the best.

10  He said his symptoms had increased since he was told about CCCMS, but his claims were

11  questionable and no one had observed any corresponding behavior.  (Dkt. No. 77-6 at 19.)

12        52.  On September 25, 2008, Dr. Rice noted that the symptoms that plaintiff

13  reported were inconsistent, reports documented that he malingered frequently and that he had

14  fabricated the story about his daughter's death.  Dr. Rice concluded that plaintiff's reports did not

15  match observations and were sometimes exaggerated.  She further noted that plaintiff

16  wanted a transfer to RJD and he frequently refused medication when in the mental health crisis

17  bed ("MHCB").[16]  (Dkt. No. 77-7 at 8.)

18        53.  On September 29, 2008, Dr. Rice noted that plaintiff's appearance was

19  adequate, his behavior polite and cooperative, he was somewhat down, and he made no eye

20  contact.  Plaintiff said his sleep and appetite were alright but his affect was constricted. He

21  denied any risk of violence and any suicidal thoughts.  Plaintiff' hallucinations were not

22  bothersome, he reported no delusions, and none had been observed or reported.  His thought

23

24      [16]  Plaintiff disputes this fact based on his personal declaration that mental health clinicians were predisposed to find he was malingering based on Dr. White's erroneous 128-B. See n.15 *infra*.  Indeed, here, Dr. Rice refers to the alleged fabrication, which was later refuted.

25  However, plaintiff adduced no medical evidence rebutting Dr. Rice's observation that plaintiff's reported symptoms were inconsistent, or her conclusion that his reports did not match her

26  observations and were sometimes exaggerated.

1  process was goal oriented and he was taking his medications.  Plaintiff said he wanted to transfer

2  to RJD but Dr. Rice said he could not because it had converted to a special needs yard and he

3  was stable in general population at his level of care.[17]  (Dkt. No. 77-7 at 10.)

4            54.  On October 8, 2008, plaintiff was more upbeat and was coping adequately.

5  He was participating in groups and was feeling better since returning from DMH.  He was

6  scheduled for weekly follow-up.

7            55.  On November 6, 2008, after this action was filed on November 3, 2008, Dr.

8  Rice observed that plaintiff's mood and affect had improved.  Plaintiff continued to report

9  unlikely symptoms for which there was no observable support.  Dr. Rice noted that plaintiff

10  tended to use the system for personal gain and that he should be transitioned to CCCMS.  She

11  noted that when a change in level of care had last been considered, plaintiff had gone to the

12  MHCB and to DMH.[18]  (Dkt. No. 77-7 at 15.)

13            56.  On November 14, 2008, Dr. Rice talked about coping skills with plaintiff,

14  noted he had increased symptoms, that there were no observable signs of the symptoms he

15  reported, and that his symptoms increased when the time for IDTT approached.  (Dkt. No. 77-7

16  at 16.)

17            57.  On December 4, 2008, plaintiff continued to claim symptoms for which there

18  was no observable evidence and his claims were not consistent.  The officers on his tier observed

19  plaintiff to be better than he claimed to be.  Dr. Rice noted plaintiff had manipulated the system

20

21         [17]  Plaintiff disputes this fact, citing to his Exhibit J.  (Dkt. No. 79 at 95.)  However,
plaintiff's Exhibit J is a copy of his July 2, 2010 administrative appeal No. CMC07-10-11296,
22  addressing plaintiff's challenge to the IDTT's June 29, 2010 refusal to renew plaintiff's 2007
mental health chrono from CMF recommending plaintiff's transfer to a Southern California
23  prison near plaintiff's family.  (Dkt. No. 79 at 79.)  Plaintiff does not explain how this appeal,
pursued almost two years after Dr. Rice's September 29, 2008 evaluation of plaintiff, is relevant
24  to Dr. Rice's findings on September 29, 2008.

25         [18]  Plaintiff disputes facts 55-59 based on his personal declaration that mental health
clinicians were predisposed to find he was malingering based on Dr. White's erroneous 128-B.
26  See n.15 infra.

in the past so that he could remain EOP and that when a change in level of care had been

discussed plaintiff had gone to the MHCB.   (Dkt. No. 77-7 at 19.)

58.  On December 8, 2008, Dr. Rice noted that plaintiff continued to report

symptoms unmatched by behavioral observations.   (Dkt. No. 77-7 at 21.)

59.  On December 17, 2008, Dr. Rice again noted that plaintiff's reported

symptoms did not match observable behaviors.  Plaintiff was stable at his current level of care

and he was to be followed-up weekly.   (Dkt. No. 77-7 at 23.)

60.  Plaintiff remained stable at the EOP level of care through IDTT on March 10,

2009.

61.  During this time, plaintiff continued to pursue a transfer to RJD.  However,

on March 18, 2009, the transfer was denied because plaintiff had a documented enemy at RJD.

62.  After plaintiff was told he would not be transferred to RJD his mental health

remained stable.

D.  Eighth Amendment Legal Standards

The unnecessary and wanton infliction of pain constitutes cruel and unusual

punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  In order to prevail on a claim of cruel and

unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently

serious deprivation and that subjectively prison officials acted with deliberate indifference in

allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical

care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth

Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050,

1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

1   (9th Cir. 1997) (en banc).

2          A medical need is serious "if the failure to treat the prisoner's condition could

3   result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

4   McGuckin, 974 F.2d at 1059 (quoting Estelle v. Gamble, 429 U.S. at 104).  Indications of a

5   serious medical need include "the presence of a medical condition that significantly affects an

6   individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical

7   need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.

8   Farmer v. Brennan, 511 U.S. 825, 834 (1994).

9          If a prisoner establishes the existence of a serious medical need, he must then

10  show that prison officials responded to the serious medical need with deliberate indifference.

11  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

12  deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

13  which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

14  (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

15  to medical care, however, "the indifference to his medical needs must be substantial.  Mere

16  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

17  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

18  105-06).  Deliberate indifference is "a state of mind more blameworthy than negligence" and

19  "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer,

20  511 U.S. at 835 (quoting Whitley, 475 U.S. at 319).

21          Delays in providing medical care may manifest deliberate indifference.  Estelle,

22  429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

23  providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

24  1056, 1057 (9th Cir. 1994); Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990).  "A

25  prisoner need not show his harm was substantial; however, such would provide additional

26  support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

1   v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see also McGuckin, 974 F.2d at 1060.

2   Finally, mere differences of opinion between a prisoner and prison medical staff

3   as to proper medical care do not give rise to a § 1983 claim.  Jackson v. McIntosh, 90 F.3d 330,

4   332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

5   In order to defeat the motion for summary judgment, plaintiff must "produce at

6   least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630,

7   that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to

8   plaintiff's health."  Jackson, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

9   E.  Analysis

10  i.  Defendant Cate

11  In the third amended complaint, plaintiff names defendant Cate in his role as the

12  Director of Adult Institutions Division, and claims Cate failed to rectify his subordinate staff's

13  transfer decision at the Director's Level of Review.  (Dkt. No. 31 at 4.)  It is undisputed that

14  defendant Cate was California's Inspector General at the time plaintiff was transferred to CMC,

15  and was appointed Secretary of the CDCR on May 16, 2008.  (Undisputed Fact ("UDF") 14.)

16  Defendant Cate was not Director of Adult Institutions in 2007 or 2008.

17  As set forth above, plaintiff now concedes that defendant Cate was not personally

18  involved in reviewing plaintiff's administrative appeal, but claims that defendant Cate was

19  personally involved due to his agency relationship as Secretary of the CDCR, and that defendant

20  Cate had personal knowledge of Dr. McDougald's December 27, 2007 recommendation because

21  plaintiff sent a letter to defendant Cate on November 19, 2008.  (Dkt. No. 79 at 4.)  However,

22  plaintiff's agency theory fails because the civil rights statute requires that there be an actual

23  connection or link between the actions of the defendants and the deprivation alleged to have been

24  suffered by plaintiff.  See Monell, 436 U.S. at 692 ("Congress did not intend § 1983 liability to

25  attach where . . . causation [is] absent.")  Even if plaintiff properly identified defendant Cate,

26  defendant Cate cannot be liable based solely on his office or his official duties.  "[T]he state

1  official must play a personal role in the constitutional deprivation to be liable." <u>Redman v.</u>

2  <u>County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).  Defendants adduced

3  evidence that defendant Cate was not personally involved in the decision to transfer plaintiff to

4  CMC, or the approval of the transfer.  (UDF 2-3, 5.)  Plaintiff failed to rebut such evidence.  In

5  addition, plaintiff adduced no evidence that defendant Cate personally delayed or interfered with

6  plaintiff's mental health care.

7      Similarly, plaintiff's reliance on the November 13, 2008 letter, addressed to Jean

8  Lynn, and a copy of which was mailed on November 19, 2008, to defendant Cate, allegedly in his

9  role as Director of the Division of Adult Institutions, is unavailing.  (Dkt. No. 79 at 14.)  The

10  letter was not addressed to defendant Cate.  The letter asked Ms. Lynn to assist plaintiff in

11  getting the Director of the CDCR to follow Dr. McDougald's December 27, 2007

12  recommendation.  (<u>Id.</u>)  At the time the letter was written, defendant Cate was the Secretary of

13  the CDCR.  And, while the letter may have informed defendant Cate of plaintiff's concerns,

14  plaintiff did not ask defendant Cate to take any action.

15      Moreover, there is no evidence that defendant Cate endorsed a plan or policy that

16  permitted any alleged mistreatment of plaintiff's mental health issues.  <u>Rizzo</u>, 423 U.S. at 370-

17  71.  Similarly, there is no evidence that defendant Cate knew or should have known from the

18  November 13, 2008 letter that the mental health care plaintiff received at CMC might violate

19  plaintiff's constitutional rights.  <u>Id.</u>  Finally, even if defendant Cate received the November 13,

20  2008 letter,[19] reading the letter and failing to take action do not rise to the level of a constitutional

21  violation, because plaintiff presented no evidence that defendant Cate recognized that there was

22  any risk of constitutionally prohibited injury.

23      Indeed, plaintiff failed to demonstrate he was facing such a risk in November of

24  2008.  Plaintiff wrote the November 13, 2008 letter long after plaintiff's April 3, 2008 transfer to

25  _____

26  [19]  Defendant Cate declares that other than the allegations of plaintiff's complaint, he has
no knowledge of the Mental Health Chrono dated December 27, 2007.  (Dkt. No. 77-3 at 2.)

1  CMC.  By that time, plaintiff's mental health clinicians found plaintiff's mental condition had

2  stabilized.  (UDF 46 (5/29/08); 49 (6/13/08 - over the past few treatment periods); 53 (9/29/08);

3  59 (12/17/08); and 60 (March 10, 2009).  Plaintiff did not provide a declaration from Dr.

4  McDougald confirming that plaintiff faced such a risk.  Plaintiff adduced no competent medical

5  evidence rebutting the stabilization of his mental health condition at CMC.  Because plaintiff was

6  found to be stable, the court cannot find plaintiff was harmed by any alleged delay in responding

7  to a letter written in November of 2008.

8           Lastly, plaintiff argues that defendant Cate is responsible because Cate allegedly

9  knew of gross deficiencies in the provision of mental health care to inmates, and failed to take

10  reasonable steps to avert an obvious risk to plaintiff's health and safety flowing from a failure to

11  remedy those deficiencies.  (Dkt. No. 31 at 5.)  Plaintiff's claim refers to the class action

12  concerning mental health care in California, Coleman v. Brown, No. 2:90-cv-0520 LKK JFM

13  (E.D. Cal.).  However, the Coleman class action does not impute knowledge or liability on prison

14  officials based on their supervisory roles in the state prison system.  Rather, a federal receiver

15  was appointed to manage the CDCR medical care system.  Moreover, as argued by defendants,

16  the historical focus of the Coleman class action was to resolve the difficulties in access to higher

17  levels of mental health care for inmates.  Coleman v. Brown, 2011 WL 4553062 *2 (E.D. Cal.

18  June 13, 2011).  During the time period relevant here, the court was concerned with the lack of

19  acute and intermediate mental health beds.  Madrid v. Tilton, 2008 WL 2200057 *4 (N.D. Cal.

20  May 6, 2008) ("The only cost effective long term sustainable solution to this problem, a problem

21  encountered at every California prison, is to implement a health facility construction program

22  that will provide adequate mental health treatment space for each mental health acuity level.")

23  Thus, defendant Cate's alleged knowledge of any mental health care deficiencies addressed

24  through the Coleman class action is too generalized to impute knowledge as to specific

25  deficiencies in the provision of mental health care at CMC.  In addition, if plaintiff had concerns

26  as to the systemic provision of mental health care at CMC, he is required to raise those concerns

with plaintiffs' class counsel in <u>Coleman</u>.  Finally, although plaintiff provided a copy of the

twentieth monitoring report of the special master in <u>Coleman</u>, (dkt. no. 79 at 40), plaintiff

adduced no evidence demonstrating that defendant Cate received or was aware of this report,

which was filed in the <u>Coleman</u> case on September 12, 2008, after plaintiff's transfer to CMC.[20]

For all of these reasons, defendant Cate is entitled to summary judgment.

ii.  <u>Defendant Knowles</u>

Plaintiff's claim that defendant Knowles is responsible based on his supervisory

role fails for the same reasons plaintiff's supervisory claims as to defendant Cate fail.  Defendant

Knowles' role as warden does not subject him to liability under a theory of respondeat superior.

In addition, defendants adduced evidence that defendant Knowles was not personally involved in

the decision to transfer plaintiff to CMC, or the approval of the transfer.  (UDF 2-3, 5.)  Plaintiff

failed to rebut such evidence.

Plaintiff also alleges that defendant Knowles was liable based on his role in the

inmate grievance process.  However, prisoners have no stand-alone due process rights related to

the administrative grievance process.  <u>See</u> <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988);

<u>see</u> <u>also</u> <u>Ramirez v. Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (holding that there is no liberty

interest entitling inmates to a specific grievance process).  Put another way, prison officials are

not required under federal law to process inmate grievances in a specific way or to respond to

them in a favorable manner.  Because there is no right to any particular grievance process,

plaintiff cannot state a cognizable civil rights claim for a violation of his due process rights based

on allegations that prison officials ignored or failed to properly process grievances.  <u>See</u>, <u>e.g.</u>,

---

[20]  The document is not a court order finding mental health care at CMC constitutionally deficient.  Rather, plaintiff cites a monitoring report of the special master on the defendants' compliance with provisionally approved plans, policies and protocols, setting forth both improvements and ongoing concerns noted during monitoring of CMC from January 8 to 11, 2008.  (Dkt. No. 79 at 40.)  While plaintiff attempts to use this information to demonstrate that the mental health care he is receiving at CMC is inadequate, such a claim is not at issue here. (<u>See</u> Dkt. No. 33 at 2:6-11.)

1   Wright v. Shannon, 2010 WL 445203 at *5 (E.D. Cal. Feb.2, 2010) (plaintiff's allegations that

2   prison officials denied or ignored his inmate appeals failed to state a cognizable claim under the

3   First Amendment).

4          In addition, plaintiff alleges that defendant Knowles failed to take corrective

5   measures during the May 22, 2008 second level review of appeal #CMF-M-08-01206, to ensure

6   that plaintiff was transferred pursuant to Dr. McDougald's 2007 recommendation, allegedly

7   depriving plaintiff of the therapeutic benefit of being housed near his family.

8          It appears undisputed that plaintiff's mental health issues are serious. McGuckin,

9   974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find

10  important and worthy of comment or treatment; the presence of a medical condition that

11  significantly affects an individual's daily activities; or the existence of chronic and substantial

12  pain are examples of indications that a prisoner has a 'serious' need for medical treatment.").

13  Accordingly, resolution of the instant motion hinges on whether defendant Knowles responded to

14  plaintiff's serious medical needs with deliberate indifference. Farmer, 511 U.S. at 834; Estelle,

15  429 U.S. at 106. To establish deliberate indifference, plaintiff must show that defendant

16  Knowles knew of, and disregarded, an excessive risk to plaintiff's health. Id. at 837.

17         Defendant Knowles' appeal findings reflect that in response to the 2007

18  recommendation, plaintiff was initially endorsed for transfer to RJD, with an alternate of CMC.

19  (Dkt. No. 77-5 at 15.) However, defendant Knowles noted that CSR Marriott endorsed plaintiff

20  to CMC, without a stated reason why. (Id.) In his findings, defendant Knowles stated he could

21  "only speculate that there were no beds available at RJD at the time of endorsement." (Id.) After

22  reviewing applicable rules and regulations, defendant set forth his determination (UDF 11), and

23  denied plaintiff's appeal at the second level of review.[21]

24

25         [21] In support of the instant motion, defendant Knowles declared that he did not
    participate in or have any knowledge of plaintiff's inmate appeal to the third level of review for
26  appeal #CMF-M-08-01206. (Dkt. 77-3 at 2.)

1        In plaintiff's appeal, he argued that his transfer to CMC was "not in conformity

2   with the written inference of the 128-C, dated 12/27/07, which was used as the underlying reason

3   for the transfer." (Dkt. No. 77-5 at 9.)  Plaintiff reiterated Dr. McDougald's statement that

4   plaintiff "would benefit from a placement in a correctional facility close to his family in Southern

5   California." (Id.)  Plaintiff noted that he was not endorsed to a prison close to his family in

6   Southern California, but was endorsed to CMC, which is in Central California.  Plaintiff pointed

7   out that his family is in San Diego, so a correctional facility close to his family in Southern

8   California would have to be RJD.  Plaintiff contended that because his transfer was solely based

9   on Dr. McDougald's recommendation, the "CSR cannot half measurably follow [such]

10  recommendation." (Id.)

11       Here, plaintiff failed to demonstrate that defendant Knowles was deliberately

12  indifferent to a substantial risk of harm by denying plaintiff's appeal at the second level of

13  review.  Plaintiff's appeal, without more, was insufficient to put defendant Knowles on notice

14  that plaintiff was allegedly at risk of constitutional injury unless plaintiff was transferred to RJD.

15  Although Dr. McDougald was plaintiff's treating clinician, Dr. McDougald simply noted that

16  plaintiff "would benefit" from being housed near his family, and "recommended" that plaintiff be

17  transferred.

18       Dr. McDougald did not state that as a part of plaintiff's mental health treatment

19  that it was medically necessary to house plaintiff near his family, or that plaintiff would be at risk

20  of serious harm if not transferred near his family.  Indeed, Dr. McDougald stated that plaintiff

21  "does not pose a threat to himself or others at this time." (Dkt. No. 77-5 at 11.)  Moreover, in

22  this appeal, plaintiff did not contend or allege facts suggesting that he faced serious risk to his

23  mental health if he was not transferred to RJD, or if he was transferred to CMC instead.

24       In support of his motion, defendant Knowles provided a declaration in which he

25  states he did not intentionally or deliberately disregard any known risk or serious injury. (Dkt.

26  No. 77-4 at 3.)  In opposition, plaintiff adduced no evidence rebutting defendant Knowles'

declaration, or demonstrating that defendant Knowles acted with a culpable state of mind.  As set

forth above, the documentary evidence from the second level review findings supports defendant

Knowles' position.  Defendant Knowles stated he could "only speculate that there were no beds

available at RJD at the time of endorsement."  (Dkt. No. 77-5 at 15.)  In the declaration

submitted in support of the instant motion, defendant Knowles declares:

> The CMC endorsement was ultimately proven to be consistent with
> Penal Code section 5068 because the RJD Enhanced Outpatient
> Program (EOP) Census from December 2007 to October 2008 later
> showed that RJD was consistently over capacity.

(Dkt. No. 77-4 at 3.)

The EOP Census chart provides three separate columns of EOP inmates, broken

out by GP (general population), ASU (administrative segregation unit), and RC (reception

center), and a fourth column totaling these numbers.  (Id.)  The EOP Census chart confirms that

the average total EOP population at RJD was 449, but the total capacity was 393.  (Dkt. No. 77-4

at 14.)  Thus, the total EOP population at RJD was over capacity during the relevant time frame.

In rebuttal, plaintiff provided the same RJD EOP Census chart, arguing that

because the GP EOP Census, of which he would have been at the time, was well below the GP

EOP capacity, there was a bed available for plaintiff at that time.  However, plaintiff provides no

evidence, other than his own declaration, demonstrating that at the relevant time frame, plaintiff

could be transferred to RJD where the total EOP capacity was exceeded, even if plaintiff was a

GP EOP inmate.  Moreover, the chart does not define the term "capacity," nor does it address the

issue of staffing; that is, even if there was capacity in the GP population for EOP inmates,

whether RJD had enough staffing to address additional EOP inmates if the total number of EOP

inmates at RJD exceeded capacity.

However, at bottom, resolution of the instant motion as to defendant Knowles

does not turn on the parties' disputes as to the actual reason for plaintiff's transfer to CMC rather

than RJD.  Instead, plaintiff must rebut defendant Knowles' evidence that he was not deliberately

25

1  indifferent to a substantial risk of harm by denying plaintiff's appeal at the second level of

2  review.

3          At the time defendant Knowles denied the second level of review, he believed

4  there was no bed available for plaintiff at RJD, as evidenced by his written statement that he

5  could "only speculate that there were no beds available at RJD at the time of endorsement" (dkt.

6  no. 77-5 at 15), and that plaintiff was appropriately classified and endorsed to a facility closer to

7  plaintiff's family in Southern California.  (Dkt. No. 77-4 at 2.)  In addition, as set forth above, the

8  appeal provided no notice to defendant Knowles that either plaintiff or Dr. McDougald believed

9  that plaintiff was at risk of substantial harm if plaintiff was not transferred to RJD.  Lastly,

10  defendant Knowles did not rescind plaintiff's transfer to CMC, but denied the appeal, which

11  allowed plaintiff to be housed about three hours closer to his family.  Thus, on this record, the

12  court cannot find that defendant Knowles was deliberately indifferent to plaintiff's serious

13  medical needs based on the denial of plaintiff's appeal at the second level.  Defendant Knowles

14  should be granted summary judgment.

15                          iii.  Plaintiff's Transfer to CMC

16          Finally, plaintiff alleges that his transfer to CMC delayed his mental health care,

17  and denied him access to adequate mental health care.  However, as noted above, it is undisputed

18  that the named defendants were not responsible for the decision to transfer plaintiff, or the

19  approval of plaintiff's transfer to CMC, and were not responsible for providing plaintiff with

20  mental health care.  Moreover, this court found that defendants were not responsible for

21  plaintiff's transfer based on their supervisory roles, and that defendant Knowles was not

22  deliberately indifferent in denying plaintiff's administrative appeal at the second level of review.

23  Thus, the court need not reach the issue of whether plaintiff's transfer to CMC, rather than RJD,

24  rose to the level of an unconstitutional denial, delay, or intentional interference with plaintiff's

25  mental health treatment, or further evaluate the mental health care plaintiff received upon transfer

26  ////

1  to CMC.[22]

2       For all of the above reasons, defendants are entitled to summary judgment.

3  V.  Conclusion

4       Accordingly, IT IS HEREBY RECOMMENDED that:

5       1.  Defendants' May 31, 2012 motion for summary judgment (dkt. no. 77) be

6  granted; and

7       2.  This action be dismissed.

8       These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

13  objections shall be filed and served within fourteen days after service of the objections.  The

14  parties are advised that failure to file objections within the specified time may waive the right to

15  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED:  January 22, 2013

17

18  _Kendall J Newman_____

19  KENDALL J. NEWMAN
   UNITED STATES MAGISTRATE JUDGE

20  robe2624.msj

21

22

23

24  [22]  The record reflects that plaintiff received mental health care upon his transfer to CMC, including the prescription of antipsychotic and psychotropic drugs, which is undisputed (dkt. no. 83 at 4), and some form of therapy, the nature and appropriateness of which is disputed by

25  plaintiff.  Plaintiff now concedes that the drugs allowed him to cope, but contends he was not stable at CMC.  (Id.)  However, as set forth above, plaintiff adduced no medical evidence in

26  rebuttal.